**ORIGINAL**

MERRICK B. GARLAND
Attorney General
RANDY S. GROSSMAN
United States Attorney
MICHAEL G. WHEAT, CBN 118598
JOSEPH J.M. ORABONA, CBN 223317
JANAKI G. CHOPRA, CBN 272246
COLIN M. MCDONALD, CBN 286561
ANDREW Y. CHIANG, NYBN 4765012
Special Attorneys to the Attorney General
880 Front Street, Room 6293
San Diego, CA 92101
619-546-8437/6695/8817/9144/8756
michael.wheat@usdoj.gov

Attorneys for the United States

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAR 17 2022

at 3 o'clock and 22 min. P M
MICHELLE RYNNE, CLERK

# UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br>　v.<br><br>DONNA YUK LAN LEONG (1),<br>MAX JOHN SWORD (2),<br>ROY KEIJI AMEMIYA, JR. (3),<br><br>　　　　　　Defendants. | Case No. CR 21-00142-LEK<br><br>I N D I C T M E N T<br>*First Superseding*<br><br><br>Title 18, U.S.C., Section 371 –<br>Conspiracy to Commit Offenses; Title 18,<br>U.S.C. § 1001(a)(2) – False Statements |

The Grand Jury charges, at all times material:

## INTRODUCTORY ALLEGATIONS

1. Defendant DONNA YUK LAN LEONG ("LEONG") was an attorney licensed to practice in the State of Hawaii. From 2013 to 2019, LEONG served as the Corporation Counsel ("COR") for the City and County of Honolulu ("City"). As Corporation Counsel, LEONG was the lead civil attorney for the City.

2. Defendant MAX JOHN SWORD ("SWORD") served two terms as a member of the Honolulu Police Commission ("HPC") from 2009-2020. From 2016-2018, he was the Chair of the HPC.

3. Defendant ROY KEIJI AMEMIYA, JR. ("AMEMIYA") served as the Managing Director for the City from 2015 to 2021. In that position, AMEMIYA assisted the Mayor of the City in domestic policy issues and overseeing the various departments of the City.

### The City and Relevant Departments

4. The City passed a budgeting ordinance for the fiscal year running from July 1, 2016, to June 30, 2017. To fund part of its operations for that fiscal year, the City received benefits in excess of $10,000 under a Federal program.

5. The Honolulu Police Department ("HPD") was within the Executive Branch of the City. HPD was the largest police department in the State of Hawaii and was responsible for providing law enforcement to almost one million residents on the island of Oahu.

6. COR was within the Executive Branch of the City. COR was headed by the Corporation Counsel, who was appointed by the Mayor and approved by the City Council. COR was composed of two divisions: the Litigation Division and the Counseling and Drafting Division. COR served as the chief legal advisor and legal representative of the Mayor, the City Council, City agencies and entities (including HPD and HPC), and all officers and employees in matters relating to their official powers and duties for the City.

7. HPC was within the Executive Branch of the City. HPC consisted of seven members appointed by the Mayor and confirmed by the City Council. All members served staggered terms of five years. All members volunteered their services and received no compensation. HPC elected its own chair and vice chair each year from among its members. HPC had the following mandated responsibilities: (1) appoint and remove the Chief of Police; (2) review rules and regulations for the administration of HPD; (3) review the annual budget prepared by the Chief of Police and make recommendations thereon to the Mayor; and (4) receive, consider, and investigate charges brought by the public against the conduct of the department or any of its members and submit a written report of findings to the Chief of Police.

8. The Department of Budget and Fiscal Services ("BFS") was within the Executive Branch of the City. BFS was the central budgeting and accounting agency for the City. Among its responsibilities were: long-range financial planning;

managing the City's operating and capital improvement budgets; managing the City's revenue, disbursement activities, and financial records; and administering the City's centralized purchasing activity.

9. The Managing Director was within the Executive Branch of the City. The Managing Director was appointed by the Mayor, served within the Mayor's office, and was next in line to assume mayoral duties in the absence of the Mayor. The Managing Director was the principal management aide of the Mayor and oversaw the departments of the City, which comprised approximately 8,000 City employees.

10. The City Council was within the Legislative Branch of the City. The City Council was the law-making body of the City. Among other responsibilities, the City Council was charged with adopting annual budgets for City operations and services, and authorizing settlements of claims against the City.

Budgeting Provisions within the City

11. Pursuant to Chapter 2, Article 3, Section 2-3.4 of the Revised Ordinances of Honolulu ("ROH"), no claim against the City could be adjusted, settled, or compromised without the prior approval of the council. The exception to this rule was codified in Section 2-3.1(d), which stated COR had the power to adjust, settle, compromise or submit to arbitration, any action, causes of action, accounts, debts, claims, demands, disputes and matters in favor of or against the City or in which the City was concerned as debtor or creditor not involving or requiring

4

payment in excess of $5,000.00; provided the money to settle claims generally had been appropriated and was available therefor; and provided further, that a quarterly report of all settlements were filed with the City Council within 15 days after the end of each quarter.

12. Pursuant to ROH Chapter 2, Article 17, Section 2-17.2(c)(1), no transfer of funds from an activity could be executed without City Council approval by resolution when the cumulative amount of transfers from that activity totaled in excess of $100,000.00 or 10 percent of the amount appropriated for that activity in the executive operating budget ordinance, whichever was less. A report of all individual transfers of funds between activities occurring within each month were to be filed with the office of the city clerk within 15 days after the end of the month. Such report must have included, but was not limited to, the following information: the amount of funds transferred, the source of funding of the transferred funds, the originating activity and character of expenditure thereof from which the funds were transferred, the activity and character of expenditure thereof to which the funds were transferred, the purpose for the transfer, and the impact of the loss of funds on the originating activity. "Activity" meant the lowest level in the appropriations ordinances at which resources were budgeted.

13. Pursuant to ROH Chapter 2, Article 17, Section 2-17.2(c)(1), no transfer of funds between characters of expenditure within the same activity could be executed without City Council approval by resolution when the cumulative

amount of such transfers exceeded the lesser of: (A) $100,000.00, or (B) the greater of: (i) 10 percent of the appropriation for either the originating or receiving character of expenditure, or (ii) $10,000.00. A report of all individual transfers of funds between characters of expenditure was to be filed with the office of the city clerk within 15 days after the end of the month. Such report must have included, but was not limited to, the following information: the amount of funds transferred, the source of funding of the transferred funds, the originating character of expenditure from which the funds were transferred, the character of expenditure to which the funds were transferred, the purpose of the transfer, and the impact of the loss of funds on the originating character of expenditure. "Character of expenditure" meant the major categories of expenditures. For the operating budget, it included, but was not limited to, salaries, other current expenses, and equipment.

14. Pursuant to Ordinance 16-14 Relating to the Executive Operating Budget and Program for the Fiscal Year July 1, 2016, to June 30, 2017, the Provision for Vacant Positions ("PVP") Account was an activity where money could be used for: (1) the regular pay for any vacant position; (2) increases in regular and premium pay; and (3) any fringe benefits costs associated with increases in regular or premium pay. Monies used for these purposes could be allocated without City Council approval. Monies used for any other purpose required City Council approval by resolution. The Director of BFS was required to submit quarterly reports concerning all transfers made from the PVP activity, with the report including: (a) Department

and Activity; (b) Job Title; (c) Date of Vacancy; (d) Projected Date of Hire; (e) Salary; and (f) Identify if the position was to be filled via contract or through the civil service process.

### Payout to Former Chief of Police Louis Kealoha

15. In or about 2009, Louis M. Kealoha ("Kealoha"), was selected Chief of HPD.

16. In or about December 2016, Kealoha was placed on paid administrative leave after being identified as the target of a federal criminal investigation that ultimately led to his indictment and conviction in *United States v. Kealoha, et al.*, CR17-00582-JMS-WRP, and *United States v. Kealoha, et al.*, CR18-00068-JMS-WRP.

17. In or about January 2017, LEONG, SWORD, and AMEMIYA, in their respective official capacities, arranged for Kealoha to retire with a payout.

18. On or about January 18, 2017, HPC approved a $250,000 payment to Kealoha in a closed executive session. The agreement called for Kealoha to receive a lump sum payment of $250,000, of which $190,000 would be a severance payment and $60,000 was fees, costs, and expenses. In part, the payment was to be made as consideration for a waiver and release of the City, HPD, HPC, and their agents from any claims stemming from Kealoha's employment or retirement. The agreement was signed by SWORD, Kealoha, and Kealoha's attorney. It was approved as to form and legality by COR.

19. On or about January 26, 2017, BFS coded the payout for Kealoha as a severance in three amounts: $99,999, $99,999, and $50,002. The payout was generated into one check: City and County of Honolulu check #20600767, drawn on Bank of Hawaii ("BOH") account x3563, dated January 26, 2017, in the amount of $160,000 ($250,000 less taxes in the amount of $90,000).

20. On or about January 27, 2017, BFS provided Kealoha's check to COR, which in turn provided the check to Kealoha's attorney.

21. On or about February 8, 2017, Kealoha's check was deposited into his Hawaii Central Federal Credit Union ("HCFCU") account x9207.

22. On or about February 9, 2017, Kealoha's check cleared the City's BOH account x3563.

23. On or about March 1, 2017, Kealoha officially retired from HPD.

## Count 1

Conspiracy (18 U.S.C. § 371)

24. The grand jury realleges and incorporates by reference Introductory Allegations 1 through 23 of this Superseding Indictment.

25. Beginning on a date unknown, but no later than December 1, 2016, and continuing until in or about July 2020, within the District of Hawaii and elsewhere, defendants DONNA YUK LAN LEONG, MAX JOHN SWORD, and ROY KEIJI AMEMIYA, JR., did knowingly and willfully combine, conspire, and agree

together, with each other and with others to commit the following offenses against the United States:

    a.    To embezzle, steal, obtain by fraud and otherwise without authority knowingly convert over $5,000 or more from a program receiving federal funding, in violation of Title 18, United States Code, Section 666(a)(1)(A); and,

    b.    To devise and intend to devise, with the intent to defraud, a material scheme and artifice to defraud and to obtain money and property from persons by materially false and fraudulent pretenses, representations, promises, and omissions of material facts, in violation of Title 18, United States Code, Section 1343.

### Manner and Means of the Conspiracy

26.    It was part of the conspiracy that the conspirators would and did attempt to materially omit and conceal and cause others to materially omit and conceal the details of the Kealoha payout from the City Council and the public.

27.    It was further part of the conspiracy that the conspirators would and did induce HPD to pay for Kealoha's payout from salary funds allocated in HPD's budget in order to circumvent City Council approval.

28.    It was further part of the conspiracy that the conspirators would and did attempt to have HPD make materially false and misleading representations and

omissions to the City Council in order to obtain the reallocation of funds from a later period to cover the funds spent by HPD for Kealoha's payout.

29. It was further part of the conspiracy that the conspirators would and did attempt to persuade HPD not to disclose to the City Council that the reason HPD sought additional funding in the fourth quarter was related to the salary shortfall caused by HPD's payment of the Kealoha payout in the third quarter.

30. It was further part of the conspiracy that the conspirators provided materially false and misleading statements to federal agents during their investigation of the Kealoha payout.

31. It was further part of the conspiracy that the conspirators, for the purpose of executing and attempting to execute the scheme to defraud the City Council and the public, transmitted and caused to be transmitted communications and transmissions by means of interstate wire.

32. Through the foregoing, and other methods and means, the conspirators induced and attempted to induce HPD to part with more than $250,000 in public funds belonging to the City for the purpose of funding the Kealoha payout.

### Overt Acts

33. In furtherance of the conspiracy, the conspirators committed the following overt acts, among others, within the District of Hawaii and elsewhere:

   a.  On or about January 6, 2017, LEONG and SWORD addressed the media to announce that Kealoha had voluntarily agreed to retire and an agreement had been reached between HPC and Kealoha.

   b.  On or about January 10, 2017, SWORD met with the then Acting HPD Chief and other HPD leadership to discuss Kealoha's retirement. During the meeting, SWORD informed the HPD personnel that HPC was planning to enter into an agreement with Kealoha with a payout in the amount of $250,000. HPD informed SWORD that it could not fund Kealoha's payout from its budget.

   c.  On or about January 10, 2017, SWORD attended the Honolulu City Council Meeting with the Public Health, Safety, and Welfare Committee, whereby City Council members questioned SWORD about Kealoha's payout. SWORD declined to comment.

   d.  On or about January 11, 2017, LEONG arranged a meeting with Deputy Corporation Counsel, HPD officials, and an HPD Senior Legal Advisor. LEONG informed the HPD officials she was working on a confidential agreement regarding Kealoha's retirement, and she could not disclose the terms of the agreement. An HPD official told LEONG that HPD could not fund a payout for Kealoha and any such payout required City Council approval. During this same meeting, LEONG spoke in private with the HPD Acting Chief, who suggested they go to the City Council for approval before making any payout to Kealoha. LEONG declined and instead suggested that HPD could avoid the need for City Council

11

review by falsely claiming that HPD had used the money to hire new employees and then later request additional funding from the City Council to make up the shortfall.

e. On or about January 11, 2017, after the meeting described in Paragraph d, the HPD Acting Chief emailed LEONG and informed her that HPD would not be able to fund a payout to Kealoha.

f. On or about January 12, 2017, LEONG called the Acting HPD Chief to discuss how payment would be made to Kealoha. The Acting HPD Chief told LEONG that City Council review would be required due to the amount of the payout. The Acting HPD Chief also expressed concern that diverting the money would lead to cutting HPD services. LEONG told the Acting HPD Chief that he should falsely state to the City Council that the money used for the payout was instead used for new hires, and ask for additional money on that basis. LEONG recommended that the Acting HPD Chief request the transfer of money from the PVP account.

g. On or about January 12, 2017, the Honolulu City Council Chair sent SWORD a letter inquiring about Kealoha's retirement arrangements and requesting a briefing for Council members before HPC's vote. The Chair wanted to know whether HPC planned to submit a proposed agreement to the City Council for review and approval.

h. On or about January 13, 2017, SWORD responded by letter, drafted by LEONG, to the City Council Chair and declined the request for a briefing,

12

stating that approval was not required because the payout was primarily based on Kealoha's employment and retirement concerns, and did not solely or primarily concern the use of City funds.

      i.     On or about January 13, 2017, SWORD met with HPD officials again and attempted to convince them that the funds for Kealoha's payout should come from HPD. HPD officials again explained that HPD did not have funds available to allocate to Kealoha's payout without cutting department services elsewhere. When pressed by HPD officials as to why the Kealoha payout needed to be funded from HPD accounts, SWORD responded, "Oh the reason it's very simple. So you don't have to go to the seven bananas I mean nine bananas up at the Council."

      j.     On or about January 13, 2017, LEONG arranged for a call with SWORD, the Acting HPD Chief, and then Director of BFS. LEONG informed the parties that the payment would come out of HPD's salary fund and that when HPD ran out of salary funds at a later time, the Director of BFS would transfer funds from the PVP account to HPD's salary account. At the end of the quarter, the Director of BFS would submit a report to the City Council about the amount he transferred from the PVP account to the salary account, and falsely state that the transfer was for the purpose of hiring a new officer to fill a vacant position at HPD. This would only require a notification to the City Council instead of City Council approval.

      k.     On or about January 19, 2017, the Acting HPD Chief sent a letter to HPD opposing the use of HPD money to fund Kealoha's payout.

13

l. On or about January 24, 2017, the Acting HPD Chief's above-referenced letter appeared in a media report. On the same date, SWORD asked the Acting HPD Chief to call the media to clarify his statement, but the Acting HPD Chief declined. AMEMIYA then told the Acting HPD Chief that he was "burning bridges" by publicly objecting to Kealoha's payout coming from HPD's budget.

m. On or about January 26, 2017, BFS personnel issued a check to Kealoha in the amount of approximately $160,000, which was net of payroll taxes.

n. On or about January 27, 2017, BFS personnel delivered Kealoha's check to COR personnel. Thereafter, COR personnel delivered the check to Kealoha's attorney.

o. On or about February 1, 2017, SWORD met with HPD officials and warned them not to make comments to the media about the Kealoha payout. Despite SWORD's warning, HPD officials made their concerns public to the media about the Kealoha payout coming out of HPD's budget.

p. On or about February 2, 2017, SWORD and the Acting HPD Chief spoke over the phone. During the call, SWORD expressed concerns about the public statements regarding the payout made by HPD officials. SWORD also stated he was preparing a media statement indicating that the $250,000 had already been paid out and that HPC was moving forward with new leadership at HPD.

q. On or about February 8, 2017, the check for Kealoha's payout in the amount of approximately $160,000 was deposited into Kealoha's HCFCU account x9207, causing an interstate wire transmission and communication.

r. On or about February 8, 2017, Kealoha issued a cashier's check for his attorney in the amount of approximately $60,000, from Kealoha's HCFCU account x9207, causing an interstate wire transmission and communication.

s. On or about February 9, 2017, the check for Kealoha's payout in the amount of approximately $160,000 cleared the City's BOH account x3563, causing an interstate wire transmission and communication.

t. On or about March 13, 2017, the Acting HPD Chief sent a memorandum to the Director of BFS requesting the movement of HPD salary funds from the fourth quarter to the third quarter to cover the salary shortfall caused in part by the payout to Kealoha. The Director of BFS approved HPD's request.

u. On or about April 18, 2017, HPD sent a letter to LEONG seeking reimbursement from COR of the $250,000 paid by HPD for the Kealoha payout.

v. On or about May 16, 2017, HPD submitted to the City Council a proposed resolution for transfer of funds asking it to authorize, among other things, a $720,000 transfer from one activity to another to cover salary expenses. Although the shortfall was due in part to the unforeseen $250,000 cost of the payout, the resolution did not specifically mention the Kealoha payout.

15

  w. On or about May 23, 2017, LEONG responded to HPD's request for reimbursement. LEONG declined HPD's request for reimbursement as entirely inappropriate, claiming that the payout to Kealoha was entirely an HPD personnel matter. LEONG further invited the BFS Director to weigh in to advise as to whether the use of funds to pay the amount authorized by HPC to Kealoha was appropriate.

  x. On or about May 23, 2017, the BFS Director sent a letter responding to HPD's letter dated April 18, 2017 and stating that HPD properly had to pay for Kealoha's payout because it was an employment matter falling within HPD's jurisdiction.

  y. On or about May 23, 2017, AMEMIYA called the Acting HPD Chief to confirm that HPD would not raise the Kealoha payout at the City Council budget hearing. AMEMIYA said he "wanted to make sure" that the Kealoha payout "did not become a story." After AMEMIYA's call, an Acting HPD Deputy Chief, W.A., revised his planned statement and removed comments that the salary shortfall included the $250,000 that was improperly paid from HPD's salary budget for Kealoha's payout.

  z. On or about May 24, 2017, Acting HPD Deputy Chief W.A. appeared and testified at a hearing before the City Council and was questioned about the money spent on the Kealoha payout. Contrary to AMEMIYA's instructions, Acting HPD Deputy Chief W.A. disclosed that the requested funds from the City Council included a salary shortfall caused by the $250,000 payout to Kealoha.

aa. On or about May 25, 2017, AMEMIYA met with HPD leadership and expressed his displeasure with the above-described testimony at the budget hearing before the City Council regarding the $250,000 payout to Kealoha.

bb. On November 13, 2017, LEONG participated in an interview with federal agents in the District of Hawaii. During the interview, LEONG provided materially false, fictitious, fraudulent, and misleading statements concerning her conversations and the circumstances surrounding the $250,000 payout to Kealoha, to wit, (1) LEONG falsely told the Federal Bureau of Investigation ("FBI") that, as far as she was aware, the Acting HPD Chief was not involved in any conversation about Louis Kealoha's payout agreement leading up to it being reached; (2) LEONG falsely told the FBI that she did not have any conversations with the Acting HPD Chief about the payment to Kealoha until after the Acting HPD Chief objected to the payment; (3) LEONG falsely told the FBI that the first time the Acting HPD Chief objected to the payout to Louis Kealoha was after the agreement had been signed; (4) LEONG falsely told the FBI that she never had any conversations with W.A. about the payment to Louis Kealoha; and (5) LEONG falsely told the FBI that Deputy Corporation Counsel, D.P., would not have been able to talk to anyone outside of the HPC while they were negotiating Louis Kealoha's agreement because that was something LEONG controlled very tightly.

All in violation of Title 18, United States Code, Section 371.

Counts 2-6

False Statements (18 U.S.C. § 1001)

34. The grand jury realleges and incorporates by reference Introductory Allegations 1 through 23 of this Superseding Indictment.

35. For a time period including November 2017, the Federal Bureau of Investigation ("FBI") had a criminal investigation into whether violations of federal law occurred with regard to Kealoha's payout. It was material to the FBI investigation to determine what steps had been taken by COR, HPC, and other City entities to approve, fund, and disclose the payout made to Kealoha from HPD.

36. On or about November 13, 2017, in the District of Hawaii, defendant DONNA YUK LAN LEONG did willfully and knowingly make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the United States:

| Count | False Statement |
|---|---|
| 2 | LEONG falsely stated and represented to agents of the Federal Bureau of Investigation that, as far as she was aware, the Acting HPD Chief was not involved in any conversation about Louis Kealoha's payout agreement leading up to it being reached. |
| 3 | LEONG falsely stated and represented to agents of the FBI that she did not have any conversations with the Acting HPD Chief about the payment to Kealoha until after the Acting HPD Chief objected to the payment. |
| 4 | LEONG falsely stated and represented to agents of the Federal Bureau of Investigation that the first time the Acting HPD Chief objected to the payout to Louis Kealoha was after the agreement had been signed. |

18

| Count | False Statement |
|---|---|
| 5 | LEONG falsely stated and represented to agents of the Federal Bureau of Investigation that she never had any conversations with W.A. about the payment to Louis Kealoha. |
| 6 | LEONG falsely stated and represented to agents of the Federal Bureau of Investigation that Deputy Corporation Counsel, D.P., would not have been able to talk to anyone outside of the HPC while they were negotiating Louis Kealoha's agreement because that was something LEONG controlled very tightly. |

All in violation of Title 18, United States Code, Section 1001(a)(2).

Dated: Honolulu, Hawaii, March 17, 2022.

A TRUE BILL

/s/ Foreperson
FOREPERSON, GRAND JURY

MERRICK B. GARLAND
Attorney General

RANDY S. GROSSMAN
United States Attorney

*Colin McDonald*

MICHAEL G. WHEAT, CBN 118598
JOSEPH J.M. ORABONA, CBN 223317
JANAKI GANDHI CHOPRA, CBN 272246
COLIN M. MCDONALD, CBN 286561
ANDREW Y. CHIANG, NYBN 4765012
Special Attorneys to the Attorney General