MERRICK B. GARLAND
Attorney General
RANDY S. GROSSMAN
United States Attorney
MICHAEL G. WHEAT, CBN 118598
JOSEPH J.M. ORABONA, CBN 223317
JANAKI G. CHOPRA, CBN 272246
COLIN M. MCDONALD, CBN 286561
ANDREW Y. CHIANG, NYBN 4765012
Special Attorneys of the United States
880 Front Street, Room 6293
San Diego, CA 92101
619-546-8437/7951/8817/9144/8756
michael.wheat@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DONNA YUK LAN LEONG (1),<br>MAX JOHN SWORD (2),<br>ROY KEIJI AMEMIYA, JR. (3),<br><br>Defendants. | CR No. 21-00142-LEK<br><br>UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT MAX JOHN SWORD'S MOTION TO DISMISS FOR BREACH OF AGREEMENT NOT TO PROSECUTE, ECF NO. 243 |

Defendant Max John Sword's motion to dismiss the First Superseding Indictment ("FSI") ignores the fact that there was never any oral, implied, or written agreement not to prosecute him. Sword's motion should be denied.

I

BACKGROUND

On March 17, 2022, a grand jury in the District of Hawaii returned a FSI charging defendants Donna Leong, Max Sword, and Roy Amemiya, Jr., with conspiracy to commit federal program theft and wire fraud, in violation of 18 U.S.C. §§ 371, 666(a)(1)(A), and 1343. The FSI also charges Defendant Leong with making false statements in violation of 18 U.S.C. § 1001.

The conspiracy charge in the FSI arises from a $250,000 payoff to Louis Kealoha, the former Chief of the Honolulu Police Department ("HPD"). *See generally* FSI at ¶¶ 15-23. The charge alleges that Leong, as Corporation Counsel for the City and County of Honolulu ("City"), Sword, as Chair of the Honolulu Police Commission ("HPC"), and Amemiya, as the Managing Director for the City, engaged in a concerted effort to fraudulently obtain and convert City funds from HPD's budget in order to secure Kealoha's payoff without first obtaining the required City Council approval. *Id.* at ¶¶ 17, 26-32. For instance, Defendant Leong suggested to HPD's then-Acting Chief "that HPD could avoid the need for City Council review by falsely claiming that HPD had used the money [to fund Kealoha's payoff] to hire new employees and then later request additional funding from the City Council to make up the shortfall." *Id.* at ¶ 33(d). According to Sword, the payout needed to come from HPD so they could avoid going "to the seven bananas, I mean nine bananas, up at the [City] Council." *Id.* at ¶ 33(i). Given the circumstances, City

2

Council approval of such a beneficial payout to Louis Kealoha was doubtful. The FSI outlines in detail the conspirators' efforts, therefore, to fraudulently obtain and wrongfully convert HPD funds, behind the City Council's back, to cover the costs of Louis Kealoha's settlement payment.

During the Federal Bureau of Investigation ("FBI") investigation Sword was interviewed, and later during the subsequent grand jury investigation, in July 2020, Sword was subpoenaed as a witness and gave testimony. Ultimately, the investigations revealed Sword's criminal conduct and his lack of candor in the grand jury. Accordingly, in December 2021, Sword was indicted.

II

LEGAL FRAMEWORK

This motion to dismiss the FSI by Defendant Sword is founded on his contention that the FSI is based on evidence and information derived from his misconception that he had somehow been granted immunity as a witness and gave statements to agents and testimony before the grand jury. However, Sword uniquely styles the motion in an effort to conflate his voluntary statements with the "posture of the crime fraud litigation."[1] ECF 234, p.1.

---

[1] It is not entirely clear what Sword means by "posture of the crime fraud litigation." No direct attack has been filed on the evidence to be presented at trial, nor would Sword even have standing to mount such an attack. In *Cole v. United States*, 329 F.2d 437 (9th Cir. 1964), the court affirmed a conviction where an attorney, Cole, pressed a grand jury witness to stand mute by invocation of his Fifth Amendment privilege. Cole's motive, the prosecution contended, was to protect both himself (the lawyer) and a close friend from the potential negative effects of a grand jury

3

Specifically, Sword contends that because he was told he was a "witness" and never informed he had become a subject or target of the investigations his statements are somehow immunized. He further claims that when he met with Special Attorneys and agents, they shared with him and his attorneys the Crime Fraud Order issued by District Judge Derrick K. Watson form CV. No. 17-00107 DKW-KJM, [ECF No. 22].[2] And, that reading this order, with his attorneys present, induced him to speak to the agents. He does not say he was shown any "privileged" evidence but does admit providing "privileged material," *via* his attorney, to agents. ECF 234, p.6 [3]

He does not, and cannot, argue that he entered into any formal immunity agreement with the United Sates, because there was never an immunity agreement.

---

investigation. The Ninth Circuit noted that "the constitutional privilege against self-incrimination is an integral part of the due administration of justice, designed to do and further justice, and to the exercise of which there is an absolute right in every witness." *Id*. at 443. Nevertheless, while "[a] witness violates no duty to claim it, ... one who bribes, coerces, forces or threatens a witness to claim it, or advises with corrupt motive the witness to take it, can and does himself obstruct or influence the due administration of justice." *Id*.  Here, the lawyer, Leong, cannot hide behind her law license to conspire with others to commit federal program theft, wire fraud, and then make false statements in an effort to conceal her role as a conspirator and then claim the plotting was protected under the attorney client privilege.

[2]   To date, this Crime Fraud Order remains undisturbed, and now a grand jury has also determined that a crime occurred.

[3]   Sword, like his co-defendants, then repeats the refrain about a search warrant issued for emails from City servers.  But ultimately the prosecution team never received, reviewed, or obtained any material from the warrant and agreed not to retain a <u>copy</u>—the City always maintained control over the original evidence—of the search warrant return provided to the independent taint team attorney.  No material from the search warrant was ever in the prosecution team's possession before Sword was interviewed by agents, or before he testified in the grand jury.

Instead, to the extent that his position that the federal agents and prosecutors deceived him in order to take his statements, he is simply wrong.

    A.    THE FIFTH AMENDMENT

The Self-incrimination Clause of the Fifth Amendment provides that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. The Self-incrimination Clause reflects "a judgment … that the prosecution should [not] be free to build up a criminal case, in whole or in part, with the assistance of enforced disclosures by the accused." *Doe v. United States*, 487 U.S. 201, 212 (1988) (citations and emphasis omitted). The touchstone of the Clause is therefore compulsion: "the Amendment does not automatically preclude self-incrimination, whether spontaneous or in response to questions put by government officials." *United States v. Washington*, 431 U.S. 181, 186 (1977). Rather, the Amendment "proscribes only self-incrimination obtained by a 'genuine compulsion of testimony.'" *Id.* at 187; *Michigan v. Tucker*, 417 U.S. 433, 448 (1974). "Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions." *Id*. at 187. The general rule is that the Fifth Amendment privilege is not self-executing, and if an individual "desires the protection of the privilege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment." *United States v. Monia*, 317 U.S. 424, 427 (1943); *see Minnesota v. Murphy*, 465 U.S. 420, 429 (1984) ("Thus it is that a witness confronted with questions that the government

should reasonably expect to elicit incriminating evidence ordinarily must assert the privilege rather than answer if he desires not to incriminate himself.").[4]

If an individual facing an official inquiry answers the government's questions without invoking his Fifth Amendment privilege, the individual's answers are generally considered voluntary for purposes of the Amendment. *Murphy*, 465 U.S. at 428. The act of answering the questions is inconsistent with a desire to exercise any right against self-incrimination, and the "government ordinarily may assume that [it is] . . . not eliciting testimony that [the witness] deems to be incriminating." *Garner*, 424 U.S. at 655. The individual may not subsequently rely on the privilege to prevent his answers from being used against him in a criminal prosecution. *Murphy*, 465 U.S. at 427, 440; *Garner*, 424 U.S. 654-656.

Applying these principles to the grand jury context, the Supreme Court has explicitly stated it has never "decided whether any Fifth Amendment warnings whatever are constitutionally required for grand jury witnesses." *United States v. Washington*, 431 U.S. 181, 186 (1977) (emphasis added); *see also Minnesota v. Murphy*, 465 U.S. 420, 431 (1984) (while a warning "might serve to dissipate any

---

[4] One well-known exception to this general rule is for custodial interrogations. *Murphy*, 465 U.S. at 429-30. The "inherently compelling pressures" of being in police custody resulted in *Miranda* – requiring "exclusion of incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it." *Murphy*, 465 U.S. at 430. This "extraordinary safeguard does not apply outside the context of the inherently coercive custodial interrogations for which it was designed." *Id*. (citation omitted). Sword was never in custody when he answered questions.

possible coercion or unfairness from a misimpression that he must answer truthfully even questions with incriminating aspects, *we have never held that they must be given to grand jury witnesses*"; emphasis added). The reason warnings have not been required is because "testifying before a grand jury does not of itself create a presumption that such testimony is coerced, even 'if in that setting a witness is more likely to tell the truth than in less solemn surroundings.'" *United States v. Smith*, 365 F. App'x 781, 785 (9th Cir. 2010) (unpublished) (*quoting Washi*ngton, 431 U.S. at 188).

Sword points to nothing to suggest that his testimony was coerced. Nor can he. "The test is whether, considering the totality of the circumstances, the free will of the witness was overborne." *Washington,* 431 U.S. at 188. Sword's free will was not overborne. He exercised his free will to testify at the grand jury. He cannot now shield that testimony from use by claiming he was under the illusion that his testimony had been immunized. "Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them. A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood." *Bryson v. United States*, 396 U.S. 64, 72 (1969). Furthermore, at the time of his grand jury testimony, Sword cannot plausibly claim he was somehow unaware of his Fifth Amendment rights. He was advised of his rights before he testified in the grand jury.

Also, because "virtually every schoolboy is familiar with the concept, if not the language," of the Fifth Amendment, *Tucker*, 417 U.S. at 439, the Supreme Court has assumed that people being interviewed in noncustodial situations are generally aware of their Fifth Amendment privilege, even though they have *not* received Fifth Amendment warnings. *See Murphy*, 465 U.S. at 429, 440 (holding that an individual on probation could have invoked his Fifth Amendment right in a noncustodial interview); *Brogan v. United States*, 522 U.S. 398, 405 (1998) ("And as for the possibility that the person under investigation may be unaware of his right to remain silent: In the modern age of frequently dramatized 'Miranda' warnings, that is implausible.").

However, Sword insists he was a target at the time he appeared before the grand jury, and that the United States "lied" to him for the purpose of "trapping" him before the grand jury. *See* Mot. at 14. He is wrong. Armed with the benefit of thousands of pages of discovery, endless time, and a Monday morning armchair, Sword attempts to paint a distorted picture of a criminal investigation. But while Sword's role is obvious now—as Sword pretty well admits—it was not then. Unlike Minority Report, the United States discovers criminal conduct only after it occurs. Sometimes, that discovery takes a significant amount of time. It takes longest when witnesses—particularly ones in government—stonewall investigations by lying to help co-conspirators instead of speaking the truth and then try to cloak their criminal conduct under the attorney-client privilege. In this case, Sword's role only became

8

apparent after more than a score of other witnesses were interviewed and testified before the grand jury. But 17 months earlier, when Sword appeared before the grand jury and swore to tell the truth, he was not a target; he was just one of many, many witnesses with potentially relevant information for the grand jury to hear in its lengthy investigation.

In any event, even if the United States had possessed real-time knowledge of Sword's role in the conspiracy and trapped him before the grand jury, that would not change the outcome here. *See United States v. McKenna*, 327 F.3d 830, 837 (9th Cir. 2003) (*citing United States v. Chen*, 933 F.2d 793, 796 (9th Cir. 1991)). "When testimony is elicited before a grand jury that is attempting to obtain useful information in furtherance of its investigation or conducting a legitimate investigation into crimes which had in fact taken place in its jurisdiction, the perjury trap doctrine is, by definition, inapplicable." *Id. (citing Chen*, 933 F.2d at 797). Here, Sword's testimony—as Chairman of the HPC—was important to the grand jury's investigation, which to no small degree focused on the events and activities of HPC in the aftermath of Louis Kealoha's target letter.

B.    TARGET, SUBJECT, AND WITNESSES IN THE GRAND JURY

The Department of Justice defines both "target" and "subject" of grand jury investigations. A "target" is a person as to whom the prosecutor, or the grand jury, has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant. Justice Manual § 9-11.151.

9

By contrast, a "subject" of an investigation is a person whose conduct is within the scope of the grand jury's investigation." *Id*.  In addition, the JM requires the giving the "Advice of Rights" to <u>targets</u> or <u>subjects</u>, advising them these warnings on the record before the grand jury, with the witness asked to affirm that the witness understands those rights:

- The grand jury is conducting an investigation of possible violations of Federal criminal laws
- You may refuse to answer any question if a truthful answer to the question would tend to incriminate you.
- Anything that you do say may be used against you by the grand jury or in a subsequent legal proceeding.
- If you have counsel, the grand jury will permit you a reasonable opportunity to step outside the grand jury room to consult with counsel if you so desire.

JM 9-11.151. There is no obligation to advise "witnesses" of their rights and obligations before the grand jury. Nonetheless, to ensure no one can later claim they were unaware of their rights, the United States is in the practice of advising all witnesses of the above rights – as it did here with Sword.

    C.    <u>IMMUNITY</u>

Sword admits he had no immunity agreement with the United States, or that he was offered any agreement to not prosecute him. Instead, without citing a single case in which the doctrine has been applied, he invokes the "concept of equitable immunity." ECF No. 234 at 10. He relies principally on *Reed v. United States*, 106 F.3d 231 (8th Cir. 1997). In that case, a habeas petitioner claimed that the United States failed to disclose the alleged "use immunity" extended to a government

10

witness. In other words, the case did not involve any suggestion that a criminal defendant could rely on "equitable immunity" to escape criminal charges. And ultimately, in *Reed*, the Eighth Circuit rejected the habeas petitioner's argument and affirmed denial of his habeas petition.

Separately, Sword also cites *United States v. Fuzer*, 18 F.3d 517 (7th Cir. 1994). That case is similarly inapposite. There, a defendant claimed his plea agreement with State authorities "incorporated the specific promise that he would not be subjected to any additional prosecution be it State or Federal." *Id.* at 519. After he was federally prosecuted, *Fuzer* appealed, claiming "equitable immunity" entitled him to have "his version" of the plea agreement enforced (e.g., permitting no federal prosecution). The Eighth Circuit rejected this argument stating, "Fuzer has failed to establish that he was promised that he would not be federally prosecuted; without an agreement, there is nothing to enforce." *Id.* at 521.

### III

### ARGUMENT

#### A. NO IMMUNITY WAS SOUGHT, OFFERED, OR GRANTED

Sword's motion to dismiss the FSI is based on the erroneous assertion that he was somehow granted immunity from prosecution and the FSI is based on evidence and information derived from his immunized statements and testimony. He is mistaken. Sword admits there was no request for immunity or a formal grant of

immunity for his statements. He argues based on his alleged perception that he would not be prosecuted.

He is wrong. No one made that promise to him. Nor did federal prosecutors lie to Sword or trick him into testifying before the grand jury.[5] Sword attempts to use hindsight to argue he was a target from the beginning. Once again, he is mistaken.

The Fifth Amendment does not protect Sword generally from being required to testify. Instead, it allows him to refuse to answer specific questions that might tend to incriminate him. He still must appear and answer those questions which do not tend to incriminate him. *Kastigar* and the other immunity cases do not suggest that the mere fact that a witness gave immunized testimony is itself privileged or confidential. If there did exist such a privilege or confidentiality, Sword would have waived it. Although the Fifth Amendment privilege against self-incrimination applies to grand jury witnesses, *see United States v. Washington*, 431 U.S. 181, 186 (1977) (*citing Counselman v. Hitchcock*, 142 U.S. 547 (1892) ), the Court has left open the question of "whether any Fifth Amendment warnings whatever are constitutionally required for grand jury witnesses." *Id*. As the Court made clear the Fifth Amendment privilege has no bearing on either an individual's target status or if an individual provides perjured testimony. First, the failure to provide warnings to

---

[5] If Sword believes any particular statements of his are inadmissible, the appropriate remedy for him to seek would be suppression, not dismissal.

12

a witness of his or her target status has no bearing on the Fifth Amendment privilege against self-incrimination. *Id*. at 189 ("Because target witness status neither enlarges nor diminishes the constitutional protection against compelled self-incrimination, potential-defendant warnings add nothing of value to protection of Fifth Amendment rights."); *see also United States v. Goodwin*, 57 F.3d 815, 818 (9th Cir. 1995).

Similarly, witnesses are not entitled to have their testimony suppressed because the Fifth Amendment "grants a privilege to remain silent without risking contempt, but it does not endow the person who testifies with a license to commit perjury." *United States v. Wong*, 431 U.S. 174, 177-178 (1977).  And, "[t]he failure to provide a warning of the privilege, in addition to the oath to tell the truth, does not call for a different result." *Id*. at 178; *see also United States v. Knox*, 396 U.S. 77, 80 (1969); *United States v. Mandujano*, 425 U.S. 564, 576 (1976).  The Supreme Court has in a variety of contexts upheld this principle, applied in Mandujano and *Wong*, that a defendant may not have his act of perjury excused, through suppression of evidence, because of constitutional violations." *United States v. Kennedy*, 372 F.3d 686, 694 (4th Cir. 2004). The same principle also extends to violations of the Sixth Amendment right to counsel. *Id*. At 694-95 (collecting cases).

In the instant case, at the time Sword testified before the grand jury, early in the pandemic, the grand jury investigation was barely under way.  A score of witnesses followed Sword to the grand jury.  After the grand jury considered all the evidence presented, they decided to indict Sword for his criminal conduct.

13

That said, in an abundance of caution, Sword, although a "witness" at the time he testified before the grand jury was advised of his rights, as was the practice for all witnesses in this case. The following colloquy was had with Sword before he testified[6]:

[**Q**uestions by prosecutor, **A**nswers by Sword]

> Q   *Did you receive a subpoena to be here today?*
>
> A   *Yes, I did.*
>
> Q   *You received a subpoena because you're a witness.*
> *You're not the subject or target of the Grand Jury investigation but merely someone who might have information that could assist the Grand Jury in the matter that it's currently considering.*
> *Do you understand that?*
>
> A   *Yes, and if I may add, Mr. Wheat I just want to confirm that I'm not a target or invest - - part of this investigation.*
>
> Q   *You're a witness not a subject or a target*
>
> A   *I -- I'm a okay. I just want to confirm that, thank you.*
>
> Q   *Okay, before I ask you any further questions let me advise you of your rights and obligations before the grand jury. You have a Fifth Amendment right against self-incrimination That means that if any statement to a question that I might put to you could implicate you in a crime you could invoke your Fifth Amendment right to remain silent.*
> *Do you understand that?*
>
> A   *Yes.*
>
> Q   *You have a Sixth Amendment right to be represented by counsel and although that lawyer cannot be present with you here in the grand jury room the lawyer could be outside in the hall, and we could take a break if you thought it was necessary to speak with that lawyer.*
> *Do you understand that?*
>
> A   *Yes, he is currently in the in the hallway.*
>
> Q   *You are represented by counsel today?*

---

[6]   In Swords motion at pages 8-9, he references the very beginning of this colloquy, but does not include the full advisal of right he received. He does this because he recognizes the full colloquy severely undercuts his already weak argument that he was a target at the time of his testimony.

14

| | | |
|---|---|---|
| A | | Yes, I am. |
| Q | | *And your lawyer is in the hall?* |
| A | | Bill McCorriston -- McCorriston |
| Q | | *M-C-C-O-R-I-S-T-O-N?* |
| A | | Yes |
| Q | | *McCorriston?* |
| A | | Yeah, William McCorriston sorry. |
| Q | | *William McCorriston. And he's out in the hall and in the presence of your lawyer I explained that to you in the hallway too as well, correct?* |
| A | | Yes, you did. |
| Q | | *And you understand that you could talk to him at any time if you need to?* |
| A | | Yes, I understand that. |
| Q | | *Okay, you also have an obligation to provide truthful complete and accurate information to the grand jury. If you were to knowingly provide material false information you could potentially be prosecuted for the felony offense of perjury or obstruction of justice. Do you understand that?* |
| A | | I understand that. |
| Q | | *So, it's incumbent that you tell the complete truth.* |
| A | | I'm sorry? |
| Q | | *It's incumbent that you tell the complete truth.* |
| A | | Yes. |

At the time Sword appeared before the grand jury he was just a witness. And although not require by law or Department policy, Sword was advised of his rights and obligations before the grand jury. He was represented by counsel, the same attorney filing this motion. He had every opportunity to privately meet and confer with his attorney. No one lied to or tricked Sword. No one promised Sword to not prosecute him. The full scope of Sword's criminal acts, and integral role in the

conspiracy, did not come into focus until a later time—as is common in any lengthy, criminal investigation.

## IV

## CONCLUSION

There was no explicit or implied grant of immunity, and thus, no agreement not to prosecute Sword. Sword's motion should be denied.

Dated: May 9, 2023.                     Respectfully submitted,

MERRICK B. GARLAND
Attorney General
RANDY S. GROSSMAN
United States Attorney

*Michael G. Wheat*

MICHAEL G. WHEAT
JOSEPH J.M. ORABONA
JANAKI G. CHOPRA
COLIN M. MCDONALD
ANDREW Y. CHIANG
Special Attorneys of the United States

UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>DONNA YUK LAN LEONG (1),<br>MAX JOHN SWORD (2),<br>ROY KEIJI AMEMIYA, JR. (3),<br><br>　　　　　Defendants. | CR No. 21-00142-LEK<br><br>CERTIFICATE OF SERVICE |

IT IS HEREBY CERTIFIED that:

I, Michael G. Wheat, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, CA 92101-8893. I am not a party to the above-entitled action. I have caused service of the foregoing on all parties in this case by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 9, 2023.

　　　　　　　　　　　　　　　　　*Michael G. Wheat*
　　　　　　　　　　　　　　　　　Brian CookMICHAEL G. WHEAT

17