MERRICK B. GARLAND
Attorney General
RANDY S. GROSSMAN
United States Attorney
MICHAEL G. WHEAT, CBN 118598
JOSEPH J.M. ORABONA, CBN 223317
JANAKI G. CHOPRA, CBN 272246
COLIN M. MCDONALD, CBN 286561
ANDREW Y. CHIANG, NYBN 4765012
Special Attorneys of the United States
880 Front Street, Room 6293
San Diego, CA 92101
619-546-8437/7951/8817/9144/8756
michael.wheat@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>    v.<br><br>DONNA YUK LAN LEONG (1),<br>MAX JOHN SWORD (2),<br>ROY KEIJI AMEMIYA, JR. (3),<br><br>                          Defendants. | CR No. 21-00142-LEK<br><br>UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT LEONG'S MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT AND SUBSTANTIVE JOINDERS, ECF Nos. 235, 238, 242, 243<br><br>Date:   May 31, 2023<br>Time:   10:30 a.m.<br>Judge:  Hon. Leslie E. Kobayashi |

The United States of America, through its counsel, hereby files its response in

opposition to Defendant Donna Yuk Lan Leong's motion for dismissal based on

prosecutorial misconduct, and the substantive joinders filed by Defendants Max

John Sword and Roy Keiji Amemiya, Jr. (collectively "Motions"). ECF Nos. 235,

238, 242, 243. For the reasons discussed below, the Court should deny the Motions.

I

FACTUAL BACKGROUND

A.    THE PAYOUT TO FORMER CHIEF KEALOHA

The Court is aware of the facts surrounding the pre-indictment investigation of this case through the First Superseding Information ("FSI") and prior litigation in this case. In summary, on December 19, 2016, the United States served a target letter on former Honolulu Police Department ("HPD") Chief Louis Kealoha. Instead of terminating Kealoha's employment due to the federal criminal investigation, the City and County of Honolulu ("City") immediately placed Kealoha on paid administrative leave on December 20, 2016.

On January 5, 2017, the Honolulu Police Commission ("HPC") met to determine Kealoha's future with HPD. HPC, led by its Chair, defendant Sword, and Corporation Counsel for the City and County of Honolulu ("COR"), defendant Leong, arranged for Kealoha to retire with a settlement payoff. On January 6, 2017, a media event was held where Leong and Sword announced Kealoha's "retirement." At the event, Sword stated that Kealoha and HPC had reached an agreement in principle as to the terms of the retirement and that the details and formal approval of the deal would be achieved by HPC by mid-January 2017.

Thereafter, starting on January 10, 2017, HPD personnel were invited to a series of meetings, in person and over the phone, by Leong, Sword, and others, including Budget and Fiscal Services ("BFS") Director Nelson Koyanagi. During

2

these meetings, Leong, Sword, Koyanagi, and others implored HPD to use their funds to fund Kealoha's payoff. The HPD personnel pushed back, stating the plan concocted by Leong and Sword improperly evaded City Council approval.

After the media announcement and initial contact with Leong and others, the command staff from HPD approached the FBI regarding what they had been told about the anticipated $250,000 severance payment to Kealoha. At the time, HPD was led by Acting HPD Chief Cary Okimoto, who took over when Kealoha put himself on administrative leave.  Okimoto told the FBI that Leong and Sword were planning on paying Kealoha a large sum of money as an alleged "severance" or "retirement" payment, and that the payment was going to be taken out of HPD's salary funds. Okimoto told the FBI that the payment was going to be made by Leong and HPC without submitting the matter to the City Council for approval. Fearing that the Kealoha payment discussions reflected what might be a criminal conspiracy among representatives of the HPC, COR, and others to misuse HPD and City funds, HPD officials secretly recorded many of their conversations with Leong, Sword, and Koyanagi. They turned these recordings over to the FBI.[1]

Over the funding objections of HPD leadership, an agreement between HPC and Kealoha was executed on January 18, 2017. At approximately 2 p.m., HPC held an Open Session, which was called to order. Board members, including Sword, and

---

[1]     In 2017, Okimoto executed written waivers of the attorney-client privilege on behalf of HPD as to all these communications. *See* ECF No. 202-2.

HPD leadership, including Okimoto, were present. At approximately 2:08 p.m., HPC Executive Members held a Closed Session, where the $250,000 payment to Kealoha was approved. During the Closed Session, Sword, a Leong deputy, Kealoha, and Kealoha's attorney executed an agreement memorializing the terms of Kealoha's "voluntary retirement from employment with the Honolulu Police Department, City and County of Honolulu, by and through its Honolulu Police Commission," effective March 1, 2017. The agreement called for Kealoha to receive a lump sum payment of $250,000, which was apportioned—"190,000 of which shall be a severance payment and $60,000 of which shall be for fees, costs, and expenses." The payment constituted "consideration for the "waiver and release" from [Kealoha] as set forth in Paragraph 6 of this Agreement." The agreement also waived any claim arising out of Kealoha's employment with HPD and/or his retirement from HPD, and any discrimination or unfair employment practice claims, but specifically exempted claims asserted in *Kealoha v. Totto* – an ongoing civil suit. Okimoto and other HPD officials were not informed of the agreement's terms until after it was executed. At approximately 5:50 p.m., HPC held another Open Session, where Sword announced that in the Closed Session HPC voted 5 to 1 to enter into a retirement agreement with Louis Kealoha. The meeting adjourned at 6:12 p.m.

The following day, January 19, 2017, Okimoto sent a letter to all HPD personnel expressing his opposition to the use of department funds for the Kealoha settlement.

4

On January 23, 2017, the BFS Payroll Chief was informed by a Human Resources Manager that he should issue a $250,000 check to Kealoha on January 27, 2017, and it would be charged to HPD's accounts. The Human Resources Manager also told the Payroll Chief that that the check would cause a deficit in HPD's accounts on February 13, 2017.

On January 25, 2017, HPD Assistant Chief William Axt ("Axt"), Okimoto, and another HPD officer attended a monthly meeting with Amemiya. Privately, Amemiya questioned Okimoto about his January 19th letter to HPD personnel opposing the funding of the Kealoha payoff from HPD accounts. Amemiya feigned being unaware that the money was coming from HPD's budget and agreed to discuss with Leong for clarification. Amemiya asked Okimoto, "you really digging your heels in about this?" Amemiya stated that he and the Mayor [Kirk Caldwell] were concerned that Okimoto was "burning bridges" by not allowing the money to be paid from HPD's budget. Okimoto sent an email to Axt and other HPD personnel detailing his meeting with Amemiya.

On January 26, 2017, a check was cut to Kealoha.  Although payroll records showed that the $250,000 payment to Kealoha was issued as a single payment, it was not processed internally in one straightforward transaction. Instead, without the HPD officials' knowledge, the money was transferred within HPD's budget in three

separate installments of $99,999, $99,999, and $52,002.[2]  Each of the three transfers was described as "severance pay" coming from the HPD payroll budget.  On the same day, Axt placed a recorded call to the Chief of the Payroll Department to discuss the processing of Kealoha's settlement check. The Payroll Chief explained to Axt that a single check was processed to Kealoha from the HPD payroll account and a "special" severance code had been created by BFS solely for this payment. The Payroll Chief appeared to believe from discussions with his boss, Koyanagi, that HPD had sufficient funds in its budget for the payment and that Okimoto had approved or directed the use of HPD funds in this manner (this was not true).

On February 1, 2017, HPC held a public meeting. Before the meeting, Sword met with Okimoto, Axt, and another HPD official, and warned them against making comments to the media. Sword said he told the media he would thank HPD for facilitating the payout (which they did not do). Sword suggested HPD follow his lead and not make a statement to the media.  Despite Sword's warning, Okimoto and Axt each registered their concern during the meeting that HPD did not have enough money in its budget to cover the $250,000 payment and said they feared the money would have to come out of other important public safety needs.  Afterwards, Sword expressed to Okimoto that he was angry they had spoken out publicly in that way.

---

[2]      This processing of the payment was part of an internal control mechanism that did not permit any payments in excess of $100,000 to be processed in a single transaction. It appears this mechanism is consistent with the requirement that payments in excess of $100,000 require City Council approval.

On March 1, 2017, Kealoha officially retired from HPD. On March 13, 2017, Okimoto sent a memorandum to Koyanagi requesting the movement of HPD salary funds from the fourth quarter to the third quarter to cover shortages caused in part by the payment to Kealoha. Koyanagi approved HPD's request and funded the shortfall.

On April 18, 2017, Axt and Okimoto sent an internal memo to Leong seeking reimbursement of the $250,000. Leong did not respond in the month that followed. Then, on May 16, 2017, HPD submitted to the City Council a proposed resolution for transfer of funds asking it to authorize, among other things, a $720,000 transfer from one activity to another to cover salary expenses. Although the shortfall was due in part to the unforeseen $250,000 cost of the settlement, the resolution did not specifically mention the Kealoha payout.  In order to get the resolution passed, Axt had to appear before the City Council's budget committee on May 24, 2017, to answer questions. Leong finally responded to Axt's April letter just a week after HPD submitted the budget resolution – and one day before Axt's scheduled testimony. In her response, Leong claimed Axt's letter contained mischaracterizations about the agreement, although she did not describe what those mischaracterizations were, nor did she address them. Leong declined HPD's request for reimbursement as entirely inappropriate, claiming the payment to Kealoha was entirely an HPD "personnel matter." Leong further invited Koyanagi to weigh in to

advise as to whether the use of funds to pay the amount authorized by HPC to Kealoha was appropriate.

Koyanagi weighed in as requested through his own letter that same day. In a later interview with the FBI, Koyanagi admitted that Leong drafted this letter for him. In "his" letter, Koyanagi said retirement payments, including those made to resolve an employment dispute, are paid from the applicable salary account of the department to which the employee is assigned. Since Kealoha was assigned to HPD, Leong—through Koyanagi— concluded the use of that account to pay the amount authorized by the Commission was appropriate.

Despite City officials' insistence that the payment was perfectly appropriate, they continued to pressure HPD officials to keep the source of the settlement funds under wraps. The same day Okimoto and Axt received these letters – one day before HPD's scheduled testimony before the City Council – Amemiya called Okimoto specifically to instruct him not to bring up the Kealoha severance package at the hearing.  Amemiya said he hoped the topic would not come up but in case it did he "wanted to make sure" that it "did not become a story." Okimoto said he would have to answer if the City Council pressed but he reassured Amemiya nobody wanted to create trouble.

Prior to Amemiya's call, Axt had prepared a draft of the brief remarks he planned to read at the budget committee meeting.  Axt planned to describe that the salary shortfall included the $250,000 that was improperly removed from HPD's

salary budget and used to fund the settlement agreement between the City and Kealoha. He further planned to state that HPD believed the payment should have come out of the City's settlement fund, not HPD's operating budget. But after Okimoto's conversation with Amemiya, Okimoto told Axt not to raise the topic at the hearing. As a result, Axt revised his planned testimony and removed the explanation for the shortfall.  He resolved that he would nevertheless answer any questions posed to him.

The next day, Axt testified at the hearing before City Council and, contrary to Amemiya's expectations, at least one Council member asked Axt about the Kealoha payment and Axt answered. Amemiya was  displeased with Axt's response, and  two days later at a monthly meeting with HPD officials Amemiya raised the issue with Axt.  Amemiya said he had seen the hearing and asked whether Okimoto had spoken to Axt about not discussing the $250,000 during his testimony. When Axt said he had, Amemiya expressed surprise that Axt chose to mention the payment anyway. Axt said that when one of the Council members specifically asked him to explain why the salary fund was short, he was left with no option than to at least mention it. Axt said he tried to touch on the topic just briefly.  Nevertheless, Amemiya repeated that they [HPD] had been advised not to bring it up.  Amemiya said they did not want to have any follow-up questions come up.  Axt apologized and added that he was trying to be transparent.

B.    JUDGE WATSON'S CRIME-FRAUD RULING

In early 2017, in an abundance of caution, the United States applied, *ex parte*, to the court to determine whether some of the recordings described above between HPD personnel and Leong were privileged or subject to the crime-fraud exception. *See* MJ 17-00075-KJM. For jurisdictional reasons, Judge Mansfield denied the United States' application and the United States appealed. *See* CV 17-00107-DKW-KJM. After further *ex parte* briefing, Judge Watson found the Court had jurisdiction to consider the United States' *ex parte* request to determine the issue of crime-fraud as to the recordings, and ultimately found – in a 39-page order – that the crime-fraud exception applied. *See* CV 17-00107-DKW at ECF Nos. 19, 22.

C.    INTERVIEWS

On November 13, 2017, Leong voluntarily participated in an interview with the FBI and a Special Attorney of the United Sates. Leong was accompanied by her First Deputy. During the interview, Leong made multiple false statements which provide the basis for Counts 2 through 6 of the FSI.  These false statements directly contradicted the several recorded conversations between HPD, COR, and HPC in January 2017. Specifically, Leong denied consulting with HPD about the settlement agreement. Leong further stated she was surprised when Okimoto publicly disagreed with the agreement. Leong claimed she did not speak with Okimoto about Kealoha's payment until after he objected to it and she could not "remember whether he objected to it either privately or publicly or at the same time the public statement in

10

the media came out." Leong subsequently said Okimoto voiced his concerns after Kealoha's payment was disbursed. Leong could not recall if "it was the day before the day of or the day after," but she thought it was after the payment was made. Leong acknowledged that Okimoto absolutely voiced his concerns after the agreement was signed.  Leong denied have any conversations with Axt about the payment. When asked whether anyone questioned whether the payment violated the requirement for City Council approval of transactions over $100,000, Leong claimed the only objection was set out in HPD's letter to her objecting to the payment "after the fact." Leong claimed her deputy would not have talked to anyone outside of the police commission, such as HPD, when negotiating the agreement.  According to Leong, "There are some things I control very tightly. This is one of them."

On February 6 and April 9, 2018, Sword voluntarily participated in two interviews with agents and prosecutors. His current defense attorney, William McCorriston,  represented him at the time and was present during both interviews.[3] During the interviews, Sword said HPC authorized him to negotiate Kealoha's retirement because HPC wanted to get the Kealoha matter "under the bridge" and move forward. HPC felt the bar to fire Kealoha was high and the process could drag on for a long time. Sword stated Leong handled the negotiations with Kealoha's attorney and kept Sword apprised. Sword claimed to not recall having conversations

---

[3]     It should be noted that at the start of the second interview, the United States advised Sword that it found he lacked candor during his first interview.

with HPD (including Okimoto) about the settlement agreement or payment. Sword believed someone at HPD raised concerns about the funding of the $250,000 payment, but said, "I wasn't privy to that information." Sword said Axt had some concerns about the funding but did not recall how the concerns were raised. Sword did not recall Okimoto raising the same concerns. Sword said he did not talk to anyone about the funding other than the commissioners and Leong. Sword stated he relied on Leong for the legality of the process. In July 2020, Sword also appeared before the federal grand jury twice.

D. THE 2019 SEARCH WARRANT

In January 2019, the United States sought, obtained, and executed a search warrant on the City's servers for several email accounts, including those assigned to the defendants in their official capacities. *See* MJ 19-00001-KJM. In response to the warrant, the City initiated litigation against the United States to limit the breadth of the warrant. This litigation occurred in CV 19-00026-JMS-KJM (now CV 19-00026-LEK-KJM). The City's litigation focused on preserving its alleged attorney-client privilege over the items the United States seized. Eventually, the litigation culminated in the United States voluntarily agreeing to not review or keep the copy of the evidence obtained through the search warrant. As a result, in September 2019, the litigation was ordered closed at the parties' request. Because it had chosen not to keep the seized materials, the United States did not rely on any of the seized materials in its investigation or grand jury presentation of the defendants' case. In

fact, the prosecution team never saw or reviewed the items seized. *See* MC 22-00103-LEK at ECF No. 22.

After the defendants were charged in this case, they served several subpoenas on the City demanding many of the items the United States had seized pursuant to its search warrant, among other items. The City sought to quash the defendants' subpoenas. *See* MC 22-00103-LEK. During that litigation, the City repeatedly misrepresented whether it maintained  the documents seized by the United States in 2019, and continued to falsely claim (along with the defendants), that the United States had destroyed evidence. In fact, as the United States learned in September 2022, through the interview of a City official, the City actually retained a complete copy of the items the United States had seized in 2019.[4] After the United States' investigation revealed the City retained an exact copy, the City produced the documents to the parties in November 2022. Thus, the parties are now in possession of the exact documents the United States had seized in 2019.

II

LEGAL BACKGROUND

A district court has "supervisory powers," which permit the court to supervise the "administration of justice" in order to deter "illegal conduct," and to protect

---

[4]     To date, the City has failed to explain whether it failed to engage in due diligence or knew but chose not to disclose the fact that it possessed an exact copy the entire time it was advancing its partisan argument with the defendants that the United States "destroyed" evidence.

"judicial integrity." *United States v. Lopez,* 4 F.3d 1455, 1463 (9th Cir. 1993) (citing *United States v. McClintock,* 748 F.2d 1278, 1285–86 (9th Cir. 1984)). Indeed, "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States,* 486 U.S. 153, 160 (1988). To preserve judicial integrity, a district court may exercise its supervisory powers to dismiss an indictment based on ethical misconduct. *United States v. Tucker,* 8 F.3d 673, 674 (9th Cir. 1993); *McClintock,* 748 F.2d at 1285–86.

Because "the judicial power to intervene in grand jury proceedings is frequently discussed, but rarely invoked," the Ninth Circuit has recognized that "an indictment may be dismissed only in flagrant cases of prosecutorial misconduct." *United States v. Sears, Roebuck & Co., Inc.,* 719 F.2d 1386, 1390–91 (9th Cir. 1983) (cleaned up); *United States v. Samango,* 607 F.2d 877, 881 (9th Cir. 1979) (court's power to dismiss an indictment for ethical misconduct is "rarely invoked"). Indeed, dismissal of an indictment is "the most severe sanction possible." *United States v. Isgro,* 974 F.2d 1091, 1098 (9th Cir. 1993); *see also Lopez,* 4 F.3d at 1464 (dismissal of an indictment for a prosecutor's ethical violations is an "extreme remedy"). Even if the court finds that a prosecutor violated an ethical duty, dismissal of the indictment is "justified only when the government's conduct substantially prejudiced the defendant and the government flagrantly disregarded the limits of professional conduct." *Lopez,* 4 F.3d at 1464. Where there is no showing of

14

substantial prejudice to the defendant, the court must consider less drastic alternatives before dismissing an indictment. *See Lopez,* 4 F.3d at 1464 (district court's dismissal of the indictment for ethical misconduct was abuse of discretion because the defendant did not show prejudice, and the court did not consider lesser sanctions). "In the grand jury context, the only identified structural error to date is discrimination on account of race or sex in the selection of grand jurors." *United States v. Harmon*, 833 F.3d 1199, 1204 (9th Cir. 2016) (holding that failures to correct false testimony or disclose impeachment information do not fall within "this narrow structural category").

## III

## ARGUMENT

The Court should deny Leong's Motion and the related joinders. Leong spends more than 25 pages of her 27-page Motion without a single citation to any legal authority that supports her motion to dismiss. Sword and Amemiya similarly have filed joinders with scant legal authority for their proposed remedy. That is telling. No such authority exists to dismiss the indictment in this case. Instead, defendants spend their time giving the Court their highly skewed view of the case. They have not provided anything more than self-serving characterizations of the alleged facts in an attempt to cast doubt on the grand jury process and this prosecution simply because they do not agree with the outcome – being charged with a federal crime.

A.    THE PRIVILEGE DOES NOT EXIST

Defendants argue the United States misled Judge Watson and Judge Seabright, witnesses, and the grand jury by violating the attorney-client privilege. ECF No. 238 at 20-25, 29-32. No such deception occurred.

To begin, defendants' arguments ignore the fact that Judge Watson's orders were rightfully obtained *ex parte* during the grand jury investigation of this criminal case. Defendants have not cited one authority to support their contention that the City should have been included in the grand jury's investigation into the criminal activities of its own employees, or that defendants have standing now to even assert the City's interests in this manner. *See, e.g.*, *In re Walsh*, 623 F.2d 489, 493 (7th Cir. 1980) (a defendant must establish the fact of an attorney-client relationship before he can invoke the privilege). Indeed, including the City in a grand jury investigation would run directly contrary to the grand jury's function. *See, e.g.*, *Blair v. United States*, 250 U.S. 273,  282 (1919) (witness is not entitled "to challenge the authority of the court or of the grand jury" or "to set limits to the investigation that the grand jury may conduct."); *United States v. Fritz*, 852 F.2d 1175, 1178 (9th Cir. 1988) ("A person under investigation by a grand jury has no right to appear before the grand jury."). Moreover, one of Judge Watson's orders focused entirely on whether the district court had jurisdiction to determine the United States' *ex parte* request regarding crime-fraud. *See* CV 17-00107-DKW at ECF No. 19. Judge Watson found the district court did have such jurisdiction. Therefore, even assuming defendants

have standing to assert the City's interests (which they do not), defendants' assertion that the United States acted inappropriately in excluding the City is directly undermined by Judge Watson's order.

Defendants also inappropriately attempt to re-litigate Judge Watson's orders before this Court. As the United States has previously argued, *see* ECF No. 202 at 22-23, Judge Watson's orders remain undisturbed and are "law of the case." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) ("Under the 'law of the case' doctrine, 'a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case.' (citing *Thomas v. Bible,* 983 F.2d 152, 154 (9th Cir. 1993)). "The doctrine is not a limitation on a tribunal's power, but rather a guide to discretion." *Id.* (citing *Arizona v. California,* 460 U.S. 605, 618 (1983)). A court may have discretion to depart from the law of the case where: 1) the first decision was clearly erroneous; 2) an intervening change in the law has occurred; 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result. *Id*. None of these conditions applies here. Judge Watson duly considered all of the evidence presented by the United States – just as this Court did in *Young v. City & Cty. of Honolulu*, Case No. Civ. 07-00068 JMS-LEK, 2008 WL 2676365, at *4 (D. Haw. July 8, 2008) – and determined that the crime-fraud exception to the attorney-client privilege had been established. Thus, this Court should deny defendants' backdoor attempts to re-litigate this issue before

this Court. *Id*. ("Failure to apply the doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion." (*citing Thomas v. Bible,* 983 F.2d at 155)).

After obtaining Judge Watson's crime-fraud orders, the United States rightfully relied on those orders in good faith in conducting its subsequent pre-indictment investigation. *See, e.g.*, *Davis v. United States*, 564 U.S. 229, 239-240 (2011) (holding exclusionary rule does not apply when the police conduct a search in objectively reasonable reliance on binding judicial precedent); *United States v. Leon*, 468 U.S. 897, 920 (1984) (applying a good faith exception where law enforcement reasonably relied on a warrant issued by a neutral magistrate, even if the warrant was later found defective).

Defendants' contention that the United States "induced" witnesses, including Sword, into divulging information through reliance on the crime-fraud orders is a false self-serving depiction. ECF Nos. 238 at 25, 31-32. In hindsight, Sword and Leong might regret voluntarily speaking with the United States, but their regret is not due to any misconduct by the United States. Their regret and misjudgment is insufficient to find the United States acted improperly. In reality, the United States took all appropriate and necessary steps to ensure it was not undermining any attorney-client privilege by continually applying to the Court to first determine the crime-fraud exception and then to unseal portions of Judge Watson's order for the specific purpose of interviewing witnesses and pursuing its investigation. In all

aspects, the United States was cautious and diligent. Finally, it is not as if Sword and Leong coughed up the crimes in their interviews with the United States—the exact opposite is true. Leong, for instance, is charged with *lying* to the United States in her interview. She cannot plausibly maintain that she was somehow wrongfully induced into lying. "Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them. A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood." *Bryson v. United States*, 396 U.S. 64, 72 (1969).

Defendants' reliance on the litigation in CV 19-00026-LEK-KJM is also unavailing. Defendants, who were not a party to that litigation, grossly mischaracterize that litigation. For example, defendants state Judge Seabright had "serious doubt" about the United States' legal theory and that "all indications are that Judge Seabright would have likely granted the City's motion for reconsideration and declared the crime fraud order invalid." ECF No. 238 at 30. This is not true. In reality, Judge Seabright said the following: "And then to the United States, you know, you can start looking at this, but I have some serious concerns whether there's any evidence of a *prima faci*e case, which is, I believe, the standard, that there's a crime under 666. *I haven't made up my mind on that*, but I think the City makes a fairly compelling argument, and you know, *maybe there are things I'm not seeing and there's case law that I'm unaware of. But that's why I need some briefing* and I need the City – I'm sorry, the United States to take it seriously because, you know,

so far in the *ex parte* submission, the United States just says, you know, there's evidence of a 666 violation. And, you know, just saying it doesn't make it so in my mind." CV 19-00026-LEK-KJM, Tr. 7/15/19 at 10: 14-25 (emphasis added). Thereafter, instead of further litigating the issue and laying out all the evidence obtained up until that point, the United States chose not to retain the copy of items seized pursuant to the search warrant and instead continue its investigation in other ways, being mindful that Judge Watson's order remained in effect and had not been overturned by Judge Watson, Judge Seabright, or any other judge. This remains the case today, despite the desperate self-serving spin defendants attempt to place on this procedural history. More importantly, Judge Seabright's concerns have since been allayed since a grand jury found probable cause to believe the defendants engaged in a conspiracy to commit 18 U.S.C. § 666, only further strengthening the crime-fraud exception found by Judge Watson.

Moreover, even beyond the crime-fraud order, there are additional reasons why no privileged material was used in this case. As outlined in the United States' prior briefing, ECF Nos. 186, 202, the United States disputes that the attorney-client relationship even existed in the first place in the circumstances of this case. The United States incorporates those arguments here.

Finally, defendants' own treatment of the allegedly privileged recordings and other materials reflects that any privilege that did exist has eroded. To be sure, Sword and Amemiya both have alluded to an advice-of-counsel defense. Sword asserted

this defense as far back as his interview with the FBI in 2018. Amemiya has asserted this position simply by virtue of joining in the instant motion to dismiss with Leong, in which Leong contends she relied on legal precedent and a memorandum drafted by her own deputy around the time of the payout. *See* ECF No. 238 at 29; ECF No. 244 (Amemiya joinder). In light of this defense, defendants cannot use the attorney-client privilege as both a sword and a shield – the privilege must give way. *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) ("The privilege which protects attorney-client communications may not be used both as a sword and a shield. Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived." (citation omitted)).

In addition, Leong's belief that the thousands of emails the United States had seized in 2019, and which all parties are now in possession of, contain exculpatory evidence leads to the obvious conclusion that defendants would likely seek to introduce such exculpatory emails at trial in some way. *See* ECF No. 238 at 27 (discussing the existence of "thousands of exculpatory mostly privileged emails"). In that case, it is unclear to the United States why defendants are attempting to exclude these emails or any piece of evidence that purportedly contains attorney-client privileged material, unless they are trying to use the privilege as both a sword and a shield, which is impermissible.

B.     THE UNITED STATES DID NOT COMMIT MISCONDUCT IN
       RELATION TO THE 2019 SEARCH WARRANT

As in other filings, defendants continue to pursue feigned problems with the
search warrant executed in 2019. Defendants question the existence of a privilege
log and the manner in which the filter review was conducted. ECF No. 238 at 26-28.
The United States has previously submitted a declaration by the filter attorney, *see*
MC 22-00103-LEK at Ex. B, and responded to defendants' requests for discovery
relating to the filter review, *see* ECF No. 152. As the United States has previously
stated, the prosecution team was not, and is not, in possession of a privilege log
created by the filter attorney. The United States does not believe a full log containing
the hundreds of thousands of emails seized from the City was created. The remedy
defendants seek for this filter procedure is unwarranted, however, given that the
United States chose not to keep the copied items seized pursuant to the warrant and
*never* used them in its subsequent investigation of the case. Thus, defendants can
hardly say they were or are prejudiced since that evidence has not been used against
them. *See Lopez,* 4 F.3d at 1464 (holding that even if the court finds that a prosecutor
violated an ethical duty, dismissal of the indictment is "justified only when the
government's conduct substantially prejudiced the defendant and the government
flagrantly disregarded the limits of professional conduct.").

Defendants also continue their false argument that the United States destroyed
evidence, specifically, the material seized pursuant to the warrant in 2019. As

22

detailed above and in previous filings, *see, e.g.*, ECF No. 186 at 19-22, the United States chose not to keep that material. But, that exact material was always maintained by the City and to this day still existed in the hands of the City, which has since produced it to the parties. Thus, it was never destroyed and defendants have not been prejudiced in any way by the United States' decision not to keep a copy of the materials initially. Continually repeating a flawed argument does not make it any truer. It is a desperately repeated phrase that has no relevance in this case, other than perhaps a self-serving motive to poison the jury pool against the United States.

C.   THE UNITED STATES DID NOT FABRICATE A CRIME

Next, defendants argue Axt and Okimoto joined forces with the FBI to fabricate a crime. ECF No. 238 at 14-20. In essence, defendants argue they were entrapped. Defendants are mistaken.

"In their zeal to enforce the law . . . Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson v. United States,* 503 U.S. 540, 548 (1992). On the other hand, "the fact that officers or employees of the Government merely afford opportunity or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells v. United States,* 287 U.S. 435, 441 (1932). Entrapment does not occur, as a matter of law, unless the Government agents do more, and, by means

23

of pressure, persuasion or enticement, induce a person to commit the offense. *Perez v. United States*, 421 F.2d 462, 465 (9th Cir. 1970).

In overcoming an entrapment defense, the government is not required to prove both lack of inducement and predisposition. *United States v. McClelland*, 72 F.3d 717, 722 (9th Cir. 1995) ("If the defendant is found to be predisposed to commit a crime, an entrapment defense is unavailable regardless of the inducement."); *United States v. Simas*, 937 F.2d 459, 462 (9th Cir. 1991) (in absence of inducement, evidence of lack of predisposition is irrelevant and the failure to give a requested entrapment instruction is not error). Inducement has been defined as "repeated and persistent solicitation" or "persuasion" which overcomes the defendant's reluctance. *United States v. Reynoso–Uloa*, 548 F.2d 1329, 1335–36 (9th Cir. 1977) (quoting *Sorrells,* 287 U.S. at 441).

The storyline in this case demonstrates the exact opposite of what the defendants would like the Court to believe (and what will be borne out at trial). That is, HPD officials did not seek out the defendants and convince them to make incriminating statements or commit incriminating acts. After all, HPD officials, at every twist and turn, resisted defendants' pressure to agree to the payout to Kealoha. It was the defendants, on their own and without input of HPD, who concocted the settlement agreement with Kealoha and who sought out HPD officials—even attempting to coerce them to lie by commission and omission—to assist them in carrying out their crimes. It was thereafter Leong's own choice to utter several false

statements to the FBI in regard to the Kealoha payout in an effort to cover her tracks. These actions are the defendants' alone. And, if anything, defendants attempted to induce HPD officials to commit crimes with them – not the other way around. For defendants to make an entrapment claim now is akin to pointing the finger at the victim of a crime. Surely this should not be allowed – this is not what the facts at trial will show and is certainly not a reason to dismiss the indictment.

### D.   DEFENDANTS' ARGUMENTS ARE FACTUAL DISPUTES FOR THE JURY

Defendants' Motions contain several factual disputes that are best left for the jury to decide. For instance, defendants discuss the provision for vacant positions, employment vacancies at HPD, the difference between a settlement and a severance, HPD's budget, and questions regarding City Council approvals. *See* ECF No. 238 at 9, 14-15, 19-20, 23, 34. These are all facts for the jury to decide.

Defendants also cite *Harris v. DeSoto*, 80 Haw. 425, 911 P.2d 60 (Haw. 1996), for the proposition that the Supreme Court of Hawaii has decided their conduct was legal. *See* ECF No. 238 at 10-12.  In *Harris*, the Hawaii Supreme Court considered a challenge by the mayor of Honolulu about whether an ordinance passed by the Honolulu city council that effectively vested exclusive power in council to settle claims in excess of $5,000, as well as suits for injunctive, declaratory, and extraordinary relief, was unlawful and void because it violated city charter and bound the mayor's office to settlements and contracts entered into by the city

council. The Hawaii Supreme Court held that the ordinance was valid to the extent that it vested power in the city council to settle claims with city funds, since managing the city's purse was within the realm of city council's functions, but the ordinance was invalid to the extent that it vested power in city council to settle claims by means other than with city funds or through exercise of authority vested exclusively in other branches of city government by the city charter. Defendants rely on *Harris* for the proposition that because former Chief Kealoha's separation agreement was an employment matter (in their view), and not a matter of use or transfer of city funds or settlement of a lawsuit, city council did not have authority over the separation agreement. As a result, defendants argue they did not have to seek city council approval for the payout.

But, defendants' reliance on *Harris* only highlights more factual disputes, i.e. whether the payout to former Chief Kealoha was a separation agreement or a settlement, among other disputes.  In any event, at a more basic level, *Harris* did not somehow give the conspirators a license to lie to other government officials in order to fund Kealoha's payout. And lies play a large role of the charged conspiracy. *See, e.g.,* FSI at ¶ 28 ("It was further part of the conspiracy that the conspirators would and did attempt to have HPD make materially false and misleading representations and omissions to the City Council in order to obtain the reallocation of funds from a later period to cover the funds spent by HPD for Kealoha's payout."). This further

confirms that these are factual disputes that cannot be decided by this Court in a motion to dismiss – they must be presented to a jury.

Thus, although defendants pressure this Court to believe that factual disputes with the United States' evidence or theory means the United States acted improperly, they point to no authority to support this. The Court should decline to reach a decision on these factual disputes and leave the fact-finding role to the jury.

E.   SWORD'S JOINDER

In his joinder, Sword advances the following arguments in support of his motion for dismissal: (1) the United States breached its implied agreement not to prosecute Sword; (2) the United States committed misconduct during Sword's grand jury testimony; (3) the United States committed misconduct by presenting privileged information to the grand jury; and (4) there was a pre-indictment delay. *See* ECF No. 242. This Court should deny Sword's motion. Since Sword has filed a separate motion for dismissal based on his erroneous assumption that he received implied immunity, *see* ECF No. 234, the United States has addressed that argument in a separate response, *see* ECF No. 256. As for Sword's arguments regarding the grand jury and privileged information, the United States' response above applies to Sword's arguments as well. That leaves Sword's argument regarding pre-indictment delay, which the United States now addresses.

The Supreme Court has recognized that the statute of limitations provides a predictable, legislatively enacted limit on prosecutorial delay and is "the primary

guarantee against bringing overly stale criminal charges." *United States v. Ewell*, 383 U.S. 116, 122 (1966); *United States v. Marion*, 404 U.S. 307, 322 (1971). "These statutes provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced." *United States v. Pallan*, 571 F.2d 497, 499 (9th Cir. 1978).

Beyond  the statute of limitations, federal courts have recognized "that the Due Process Clause has a limited role to play in protecting against oppressive (preindictment) delay." *United States v. Lovasco*, 431 U.S. 783, 789 (1977).  The courts have applied a two-prong test for determining if preindictment delay has risen to the level of a due process violation. *United States v. Moran*, 759 F.2d 777, 780-81 (9th Cir. 1985) (citing *Lovasco*, 431 U.S. at 789; *United States v. Mills*, 641 F.2d 785, 788 (9th Cir. 1981)).  Under the first prong of the test, the defendant has the burden to prove "actual, nonspeculative prejudice resulting from the delay." *Pallan*, 571 F.2d at 500 (citing *Lovasco*, 431 U.S. at 790; *United States v. Mays*, 549 F.2d 670, 677 (9th Cir. 1977)).  Only after defendant has met his burden, does the court apply the second prong, which is a balancing test where the court weighs the length of the delay with the reasons for the delay and the prejudice to the defendant. *Moran*, 759 F.2d at 781-83; *Lovasco*, 431 U.S. at 790.

     1.    *Sword has not met his burden to establish actual prejudice*

In nothing more than a conclusory manner, Sword claims that the loss of a witness, Nelson Koyanagi, caused him to suffer actual prejudice. ECF No. 242 at

20. At the outset, Sword overlooks that he had the opportunity to depose Koyanagi before he passed away. See ECF Nos. 74, 78. And it appears Leong, for instance, intends to seek to introduce Koyanagi's preserved testimony at trial. *See* ECF No. 235 at 11–12.[5] Sword's counsel also asked Koyanagi questions during the deposition. During that questioning, Koyanagi said he knew Sword by name, that he did not recollect conversations with Sword regarding the payout to Kealoha, and that he did "not offhand" recall getting involved in severance payments for department members, and that he "wouldn't know" if "severance payments were normal for city employees[.]" Sword's counsel did not ask any additional questions or make any additional effort to elicit testimony from Koyanagi, so it is entirely unknown: (1) what other questions Sword would ask Koyanagi, or (2) whether Koyanagi had answers to those questions. Notably, as early as October 3, 2018, in an interview with the FBI, Koyanagi stated he had difficulty remembering the events surrounding Kealoha's payout. At that time, he only remembered speaking to Leong, but could not recall the substance of those conversations. He could not recall speaking to others. *See* ECF No. 44 at 8. Otherwise, damaging the defendants' case, Koyanagi stated that he followed Corporation Counsel's guidance—e.g., Leong's department—as his attorney. *See id.* Given Koyanagi's apparent memory failings

---

[5]    Under Fed. R. Crim. P. 15 (f), "an order authorizing a deposition to be taken under this rule does not determine its admissibility. A party may use all or part of a deposition as provided by the Federal Rules of Evidence." The admissibility of Koyanagi's testimony has not been determined.

about his interactions with Sword, based on Sword's logic, the United States should have indicted this case prior to October 2018—effectively shrinking the statute of limitations to less than two years.[6] That cannot be the law. Sword wrongfully places blame on the United States for Koyanagi's memory loss that apparently occurred well within the statute of limitations period. Dismissing the indictment under these circumstances is not appropriate.

Furthermore, Sword baldly claims that Koyanagi is the "only witness who could provide direct evidence as to his intent." *Id.* at 21. Koyanagi's intent is not in question here—the conspirators' intent is. Moreover, defendants cannot credibly point the finger at Koyanagi where he (1) previously admitted that *Leong* wrote the letter under his name opining that retirement payments were paid from the applicable salary account of the department to which the employee was assigned; (2) said that the provisional account would not have been used for a settlement or severance; it was meant for vacant provisions; (3) as early as March 2018, denied speaking with Sword about the payout; and (4) by October 2018, said he had difficulty remembering the events surrounding the payout. *See* ECF No. 44 at 7-8.

Moreover, at a broader level, Koyanagi did not possess unique knowledge about Honolulu's budgeting provisions that cannot be gleaned from any other

---

[6]    Prior to this October 2018 interview, in a separate interview in March 2018, Koyanagi said his only involvement in the payout would have been to process the payment. ECF No. 44 at 7. He did not recall any conversations with HPD about the payout and he denied speaking with Sword about the payout. *Id.* at 7-8.

source. The budgeting provisions did not exist in Koyanagi's head—they are written down in law. There are other employees at BFS. There is a current head of BFS. There are longtime employees at Corporation Counsel. Sword does not endeavor to explain how Koyanagi alone holds the critical testimony about Honolulu budgeting provisions. His claims do not arise to actual prejudice.

Indeed, a "defendant has a heavy burden to prove that a preindictment delay caused actual prejudice: the proof must be definite not speculative, and the defendant must demonstrate how the loss of a witness and/or evidence is prejudicial to his case." *Moran*, 759 F.2d at 782 (citing *Mays*, 549 F.2d at 677; *United States v. Carruth*, 699 F.2d 1017 (9th Cir. 1983)). The Ninth Circuit has acknowledged that its cases "reflect this heavy burden, as [the Court has] often found actual prejudice lacking in the record." *Id.* (citing *Mills*, 641 F.2d 785).

Sword failed to discuss in his motion the plethora of cases where the Supreme Court and Ninth Circuit have found that actual prejudice was lacking when a witness had died—even where a deposition had not previously been secured—and the defendant failed to acknowledge alternatives. That is because these cases are fatal to Sword's attempt to meet the actual prejudice standard in this case.

In *Moran*, a case cited by Sword but not discussed, the district court had dismissed sixteen counts for preindictment delay because the defendant claimed he was prejudiced by the loss of witness testimony and impairment of witness memories. 759 F.2d at 779, 782. Two of the witnesses had died. *Id.* at 782. The

Ninth Circuit had "serious doubts whether [the defendant had] made any showing of prejudice beyond that which the statute of limitations is designed to control." *Id.* at 783.  Moreover, the Ninth Circuit found defendant failed to make any showing of government culpability in causing the delay. *Id.*  Instead, the Court acknowledged that the delay was proper given the government investigative efforts. *Id.*

Similarly, in *Pallan*, the defendant attempted to show actual prejudice by asserting that the delay by the government resulted in lost witnesses – including one witness who had died. 571 F.2d at 501.  The Ninth Circuit disagreed and emphasized that protection from lost testimony generally falls solely within the ambit of the statute of limitations, not the Due Process Clause. *Id.* at 500-01. The court also questioned whether such lost testimony would ever qualify for the level of actual prejudice required to establish a due process violation and found that the defendant's claims were speculative. *Id.*  This is because "[t]he assertion that a missing witness might have been useful does not show 'actual prejudice'…." *Id.* at 501 (quoting *Marion*, 404 U.S. at 321-22). The Ninth Circuit found that while the testimony of the deceased witness may have been of some benefit, the defendant failed to make a nonspeculative and definite demonstration that its loss actually impaired his ability to meaningfully defend himself against the charges. *Id.*

In another missing witness case, the defendant claimed that he suffered prejudice because one witness, who took care of him, was unavailable. *United States v. Horowitz*, 756 F.2d 1400, 1405 (9th Cir. 1985). The defendant alleged a due

process violation because the missing witness was "best able to testify to the effect of the medication on his conduct and memory." *Id.*  However, the Ninth Circuit found no actual prejudice from this missing witness. *Id.*  Instead, it held that "[m]ere assertions of a missing witness might have been helpful...is not 'proof of actual prejudice.'" *Id.* (citation omitted). Moreover, the Ninth Circuit also noted that the missing witness was not the only source of the information defendant sought to present. *Id.*  It concluded that defendant failed to meet his burden of showing actual prejudice, and therefore, it was "unnecessary for [the Court] to consider the length of, or the reasons for, the delay." *Id.* (citation omitted).

In *United States v. Carruth*, the defendant alleged he suffered actual prejudice from preindictment delay because one of his witnesses, an accountant, died shortly before the indictment and could not testify on the defendant's behalf. 699 F.2d 1017, 1019 (9th Cir. 1983).  The defendant alleged that the accountant's testimony would have exonerated him and would have provided exculpatory evidence. *Id.* However, the district court and the Ninth Circuit disagreed.  The courts refused to find actual prejudice where the defendant's assertions were based upon speculation that the missing testimony would have contained exculpatory material. *Id.*

Lastly, in *Mays*, the defendant claimed he suffered actual prejudice from the deaths of three material witnesses. 549 F.2d at 673.  The defendant failed to provide any definite evidence of the deceased witness's usefulness to his case. *Id.* at 679. The Ninth Circuit found this was insufficient to establish actual prejudice.  *Id.* at

680. The Court noted that documentary evidence existed to support their defense and that it was unclear whether the deceased witness's testimony would more likely have been helpful than harmful to the defendant. *Id.* (citation omitted).

Similar to *Moran*, *Pallan*, *Horowitz*, *Carruth*, and *Mays*, Sword has made mere assertions that the deceased witness might be helpful to his defense. This is not enough. His claims that Koyanagi is the *only* person in BFS who can testify and provide the evidence he seeks is dubious at best.

Put simply, Sword has failed to meet his hefty burden of establishing actual prejudice. His case is no different from *Moran*, *Pallan*, *Horowitz*, *Carruth*, and *Mays*, where the Ninth Circuit found the defendants' speculative assertions of expected testimony and alleged exculpatory evidence had failed to establish actual prejudice required to meet the first prong of the test.

Since Sword has failed to meet his burden of showing actual prejudice from the missing witness, the Court should find there was no preindictment delay.

2.     *The length of the delay and reasons for the delay were not offensive*

Even assuming Sword could meet his burden of showing actual prejudice – which he has not – his next contention that the United States' delay occurred for "offensive reasons" is unsubstantiated. ECF No. 242 at 22-24. Sword provides his own self-serving description of what he believed occurred between the time when the conspirators engaged in the conspiracy and only a select portion of the United

States' investigation through September 2019. However, Sword intentionally omits the impacts of the COVID-19 pandemic on the availability of the grand jury in 2020 and 2021, the change in the prosecution team in September 2020, and the additional investigative steps that occurred between September 2019 and December 2021. These intentionally omitted facts by Sword are fatal because these facts show that no such preindictment delay occurred, let alone one that would require the most severe remedy as dismissal of the indictment.

The investigation into the crimes in this case was initially conducted by the FBI and two other Assistant United States Attorneys – both of whom were appointed by the Attorney General as Special Attorneys in the District of Hawaii. From January 2017 through September 2020, the United States gathered evidence, conducted witness interviews, litigated matters concerning the grand jury, including the crime-fraud exception before Judges Mansfield and Watson, obtained a search warrant, had a taint attorney unaffiliated with the investigation team conduct a review of search warrant materials, and attempted to negotiate a preindictment resolution with Leong.

The original prosecution team was replaced by the current team given the original team's pending departures from the U.S. Attorney's Office in the Southern District of California.

In March 2020, the COVID-19 pandemic shutdown the judicial system. Courthouses were closed, and grand juries were no longer convening to hear evidence. Throughout the COVID-19 pandemic in 2020 and 2021, there were

limited appearances before the grand jury in the District of Hawaii to ensure the health and safety of the community. In addition, travel between the mainland and Hawaii was heavily restricted until the vaccines became available in 2021. Nevertheless, the prosecution team continued to present evidence and more than twenty witnesses to the grand jury between July 2020 and March 2022, which is when the superseding indictment was returned by the grand jury.

*Lovasco* is instructive on the claim of investigative delay. There, the defendant was indicted approximately eighteen months after the crime allegedly occurred. 431 U.S. at 784-85. Defendant claimed that little information was developed in the seventeen months prior to indictment. *Id.* As a result of the delay, the defendant claimed he lost material evidence that deprived him of due process. *Id.* The Supreme Court disagreed. It held that prosecuting a defendant following investigative delay does not constitute a deprivation of due process, even if the defendant's "defense might have been somewhat prejudiced by the lapse of time." *Id.* at 796. "In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely 'to gain tactical advantage over the accused … precisely because investigative delay is not so one-sided.'" *Id.* at 795 (internal citation omitted).

Here, as in *Lovasco*, additional investigation was needed and justified the delay in presenting an indictment to the grand jury. Also, the COVID-19 pandemic in 2020 and 2021 was unavoidable and contributed to any perceived delay. Moreover, the investigative timeline directly contradicts Sword's misimpression that

36

the United States had "substantially completed its investigation" in September 2019.
ECF No. 242 at 23-24.  Even had that been the case in September 2019, the Supreme
Court has said that "[i]t should be equally obvious that prosecutors are under no duty
to file charges as soon as probable cause exists but before they are satisfied they will
be able to establish the suspect's guilt beyond a reasonable doubt." *Lovasco*, 431
U.S. at 791.  "[N]o one's interests would be well served by compelling prosecutors
to initiate prosecutions as soon as they are legally entitled to do so." *Id.* at 792.  "This
is especially so in cases where a criminal transaction involved more than one person
or more than one illegal act," as in this case. *Moran*, 759 F.2d at 783 (citing *Lovasco*,
431 U.S. at 793)).

When the complete timeline of the investigation and grand jury presentation
is weighed along with the existence of the COVID-19 pandemic against any
prejudice alleged by Sword, the balance is overwhelmingly against finding a due
process violation, let alone the most severe consequence of dismissal of the
indictment.  The record in this case is absent of any evidence of misconduct or
culpability by the United States, and Sword's bald assertions and self-serving claims
to the contrary are unavailing.[7] *See, e.g., Moran*, 759 F.2d at 783 ("our cases clearly
require some showing of governmental culpability to prove a deprivation of due

---

[7]   It is tragic what happened to Koyanagi, but his medical complications were
learned during the middle of the COVID-19 pandemic and his life expectancy as
provided to the United States was less than six months, which was February 2021.
The United States had not yet completed its grand jury investigation at the time, as
more than ten witnesses were presented before the grand jury after February 2021.

process) and (citing *United States v. Swacker*, 628 F.2d 1250, 1254 n.5 (9th Cir. 1980)).  Moreover, the timeline discussed above also shows that the United States did not present the case for indictment in December 2021 for any tactical maneuver or advantage over the defendants.[8] As Sword deftly acknowledges, had Koyanagi not been terminally ill, he may very well have been presented to the grand jury as a proposed defendant in this case.  Given his role in the conspiracy, it is unclear from Sword's motion whether Koyanagi's testimony would be more likely to have been helpful or harmful to the defendants – or, more importantly, whether he would have invoked his right to remain silent had he been called by Sword, which would make him unavailable nonetheless. Lastly, it also unclear how his testimony would benefit Sword's defense.  It appears based purely on speculation.

Finally, as set forth above, in March 2018, Koyanagi said he could not recall any conversations with HPD about Kealoha's payout, and by October 2018, Koyanagi said he had difficulty remember the events surrounding the payout and could not recall speaking to anyone but Leong about the event. In other words, Sword has made no showing that any of his desired testimony from Koyanagi would

---

[8]      Sword contends there was a delay between the indictment and unsealing and arrest between December 2021 and January 2022.  However, Sword is aware of the intervening holidays during that time, which caused the delay.  More importantly, the "courts have traditionally granted the government a good deal of leeway in their decisions as to the timing of arrests and indictments." *Mays*, 549 F.2d at 678 (citations omitted).  The Court should afford that same leeway in this case given the intervening holidays.

have been available even if the United States had indicted this case in 2018 or 2019.[9] The United States is not to blame for these circumstances.  For all of these reasons, the Court should reject Sword's contention that there was any preindictment delay.

F.   <u>AMEMIYA'S JOINDER</u>

In his joinder, Amemiya incorporates by reference all of the arguments advanced by Leong. *See* ECF No. 243 at 2. Amemiya additionally asks this Court to judicially estop the United States' position regarding Judge Watson's crime-fraud order. *Id.* at 3. This Court should dismiss Amemiya's arguments.

Under Federal Rule of Criminal Procedure 12(b)(2), "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of general issue." The Ninth Circuit has applied the Rule 12 standard to hold that "a motion to dismiss is generally 'capable of determination' before trial 'if it involves questions of law rather than fact." *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993), *quoting United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986) (overturning district court's grant of a motion to dismiss based on the finding that Nukida's actions did not affect commerce. The motion to dismiss required factual determinations and thus was a premature challenge to the sufficiency of the government's evidence.); *see also United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002).

---

[9]   The letters supplied by Koyanagi's attending doctors during the leadup to his deposition further support this position.

It is fundamental that Rule 12(b) may not be used to challenge the sufficiency of the evidence supporting an indictment. *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1995). In *Jensen*, the Ninth Circuit found "[a] defendant may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence." *Id*. (*quoting United States v. Mann*, 517 F.2d 259, 267 (5th Cir.1975)). "[A] motion to dismiss the indictment cannot be used as a device for a summary trial of the evidence.... The Court should not consider evidence not appearing on the face of the indictment." *Id*. (quoting *United States v. Marra*, 481 F.2d 1196, 1199-1200 (6th Cir. 1973)); *accord, United States v. Alonso*, 143 F.3d 772, 776-77 (2d Cir. 1998) ("Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial to satisfy the jurisdictional element of the offense, the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment.").

Judicial estoppel is an equitable doctrine that "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (*quoting Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)). The doctrine prohibits a party from taking inconsistent positions in the same or related litigation. Because the rule is intended to prevent "improper use of judicial machinery," *Konstantinidis v. Chen*, 626 F.2d 933, 938 (D.C. Cir. 1980), judicial estoppel "is an equitable doctrine invoked by a court at its discretion," *Russell v. Rolfs*, 893 F.2d

1033, 1037 (9th Cir 1990). The Supreme Court has observed that it is well settled that the government may not be estopped on the same terms as any other litigant because when the government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. *Heckler v. Community Health Services of Crawford Cty., Inc.*, 467 U.S. 51, 60 (1984). In fact, the Supreme Court has repeatedly directed that an estoppel will rarely work against the government, and the Court recently stated that a private party trying to estop the government has a heavy burden to carry. *Id.*  One of the considerations that typically informs the decision of whether to apply the doctrine in a particular case is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *New Hampshire*, 532 U.S. at 751.

Defendants have not identified any criminal case in which the court has enforced an estoppel against the government. In *United States v. Garcia*, the Ninth Circuit affirmed the district court's decision to not apply judicial estoppel against the government in a criminal case. 37 F.3d 1359, 1366–67 (9th Cir. 1994), *abrogated in part on other grounds by United States v. Jackson*, 167 F.3d 1280 (9th Cir. 1999).

Because of the traditional reluctance to allow criminal defendants to estop the government and the unlikelihood that a defendant suffered any unfair detriment, this Court should not exercise its discretion in favor of the defendants. *United States v. Grap*, 368 F.3d 824 (8th Cir. 2004).

Even assuming, for the sake of argument, that judicial estoppel is available against the United States in this case, defendants have not satisfied the requirements for judicial estoppel. Although "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," the Supreme Court has identified three factors that "typically inform the decision whether to apply the doctrine in a particular case": first, a party's later position must be "clearly inconsistent" with its earlier position; second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and, third, is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *New Hampshire*, 532 U.S. at 750–51 (internal citations and quotation marks omitted). Also, the Ninth Circuit has held that "chicanery or knowing misrepresentation by the party to be estopped is a factor to be considered in the judicial estoppel analysis." *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 995 (9th Cir. 2012).

### 1.   *Clear Inconsistency*

When the United States sought a search warrant for City computers the warrant explained the then known facts. The United States later agreed, having never seen the search warrant return, not to receive the information. Defendants conflate

the reason why the United States believed evidence of a crime would be found with persuading a court that the evidence actually found was admissible. This is not an inconsistent position, much less a clear inconsistency.

### 2.    *Prior Court Acceptance*

Choosing not to pursue a particular avenue to find evidence does not make the existence of the evidence inadmissible. No court was misled.

### 3.    *Unfair Advantage or Detriment*

Not having seen the evidence, there is no indication that there would either be unfair advantage to the United States or unfair detriment to the defense if the court does not apply judicial estoppel in this instance. The United States seeking a search warrant is not directly pertinent to the germane issue of whether there is evidence on the City servers that exposes defendants' criminal conduct.

Moreover, the United States still needs to satisfy its burden of authenticating defendants' statements under the Federal Rules of Evidence. Not applying judicial estoppel does not otherwise lessen or eliminate this burden of authentication, and thus, defendants will not suffer any unfair detriment since the United States is still held to the same burden of authentication.

### 4.    *Knowing Misrepresentation*

There is no indication that the United States engaged in knowing misrepresentation to either this court, Judge Watson, or Judge Seabright. As discussed above, our current position is not "clearly inconsistent" with our

statements to either Judge Watson or Judge Seabright, despite the defendants' self-serving interpretation.

Here, the four identified factors weigh against applying judicial estoppel. Further, the purpose of judicial estoppel is to "prevent a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire*, 532 U.S. at 749 (emphasis added). Here, the United States did not receive evidence from the search warrant and could not rely upon it. Judicial estoppel is wholly inapplicable in this criminal case.

IV

CONCLUSION

For the reasons stated, the Court should deny the Motions.


Dated: May 9, 2023.                     Respectfully submitted,

                                        MERRICK B. GARLAND
                                        Attorney General


                                        RANDY S. GROSSMAN
                                        United States Attorney


                                        */s/ Janaki G. Chopra*
                                        MICHAEL G. WHEAT
                                        JOSEPH J.M. ORABONA
                                        JANAKI G. CHOPRA
                                        COLIN M. MCDONALD
                                        ANDREW Y. CHIANG
                                        Special Attorneys

UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DONNA YUK LAN LEONG (1),<br>MAX JOHN SWORD (2),<br>ROY KEIJI AMEMIYA (3),<br><br>Defendants. | CR No. 21-00142-LEK<br><br>CERTIFICATE OF SERVICE |

IT IS HEREBY CERTIFIED that:

I, Janaki G. Chopra, am a citizen of the United States and am at least eighteen years of age.  My business address is 880 Front Street, Room 6293, San Diego, CA 92101-8893. I am not a party to the above-entitled action.  I have caused service of the foregoing on all parties in this case by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 9, 2023.          */s/ Janaki G. Chopra*
                                   JANAKI G. CHOPRA

45